# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No.: 9:16-cv-02550-RMG |
| Plaintiff, | |
| vs. | |
| 269 ACRES, MORE OR LESS, LOCATED IN BEAUFORT COUNTY, STATE OF SOUTH CAROLINA; HAROLD E. TRASK, JR.; JOHN DONALD TRASK; JAMES HEIDE TRASK; MARGARET SCHEPER TRASK; WILLIAM D. TRASK, JR. AS TRUSTEE OF THE WILLIAM D. TRASK JR. TRUST UNDER ARTICLE NINE OF THE WILLIAM D. TRASK REVOCABLE TRUST DATED FEBRUARY 17, 2000; SARAH T. BURRUS, AS TRUSTEE OF THE SARAH T. BURRUS TRUST UNDER ARTICLE NINE OF THE WILLIAM D. TRASK REVOCABLE TRUST DATED FEBRUARY 17, 2000; ROBERT EDWARD L. HOLT III, AS TRUSTEE OF THE KITTY TRASK HOLT FAMILY TRUST-MARITAL BOTH UNDER THE LAST WILL AND TESTAMENT OF KITTY TRASK HOLT DATED JUNE 8, 2004; ET AL, | **FINAL DETERMINATION OF JUST COMPENSATION AND RECOMMENDATIONS BY THE COMMISSION** |
| Defendants. | |

## I.    INTRODUCTION

This is a land condemnation matter brought by the Plaintiff United States of America (the "Government"). The Government has placed a permanent, restrictive easement on 269.22 acres of the Defendants' (the "Landowners") property located in northern Beaufort County, South Carolina (the "Encumbered Property"). The purpose of the easement is to prohibit any

development in the flight path of jets using the U.S. Marine Corps Air Station in Beaufort (the "MCAS"). The sole issue in this case is the appropriate amount of "just compensation" owed to the Landowners for the taking of their property by the Government.

The Government filed its Complaint in Condemnation on July 15, 2016 in the United States District Court for the District of South Carolina, and, on July 22, 2016, it deposited $1,091,000 with the Court as estimated just compensation for the taking.[1] Dkt. Nos. 1 & 7. The Landowners filed an Answer on September 19, 2016, disputing this amount. Dkt. No. 14. The Landowners contend that the Encumbered Property has been devalued by $8,076,600 and that the unencumbered property has been devalued by at least $1,603,980, thereby entitling them to just compensation of $9,680,580.

By order entered on February 8, 2018, United States District Judge Richard M. Gergel appointed a three-person commission to determine compensation pursuant to Rule 71.1(h)(2) of the Federal Rules of Civil Procedure (the "Commission"). Dkt. Nos. 87 & 93. Following pre-trial briefing from the parties, this matter was tried before the Commission on August 14 and 15, 2018. The Landowners elicited testimony from Harold Trask, Jr., John "Donald" Trask, and James Trask (the "Landowner Witnesses"), three owners of the Property; Thomas Harnett, an appraisal expert; and Gregory Ness, an expert in solar development. The Government called Keith Batson, an expert offered for the sole purpose of rebutting Mr. Hartnett's appraisal; Cassandra Norris, a supervisory realty specialist and real estate contracting officer for the United States Navy; Lieutenant Colonel Philip Williams, the former director of operations at the MCAS; Kimberly Statler, the former executive director of the Lowcountry Economic Alliance, via video testimony; and Haywood Newkirk, an appraisal expert.

---

[1] At trial, however, the Government argued that just compensation for the taking is $937,800.

After consideration of the testimony, the exhibits offered in this case, and the arguments of counsel for both parties, the Commission makes the following Findings of Fact and Conclusions of Law, and Final Determination and Recommendation of Just Compensation.

## II. FINDINGS OF FACT

### The Property Pre-Taking

The subject property is located just outside of downtown Beaufort, and consists of 536.55 acres (the "Property"). Tr. at 29:8-12; 126:14-16, 482:18; Landowners' Ex. 14 at 11, 30; Government's Ex. 1 at 96. Due to its size and proximity to downtown Beaufort, and its undeveloped state, all appraisal experts agree that it is a unique property. Tr. at 92:8-13, 534:10-14. Harold E. Trask, Sr. purchased the Property in 1955 and the Landowners inherited the Property from his estate. Tr. at 26:24-27:1, 30:7; Landowners' Ex. 1 & 2. The family has owned the Property in fee simple since 1955.[2] Tr. at 26:15-27:14.

The Property is undeveloped land with excellent road access and visibility and, unusual for the South Carolina Lowcountry, few wetlands. Tr. at 97:13-16, 120:10-15, 482:15-19. The Property is located on, and has significant road frontage to, Parker Drive, which is a newly paved two-lane road off of Highway US-21. Tr. at 35:20-21, 36:16-37:3, 99:7-18, 482:12-16. It is located twenty miles or less from Interstate-95 and is situated between two major cities— Charleston and Savannah—both of which have large shipping ports and are home to major aerospace manufacturing companies. Tr. at 120:10-15, 121:13-16. The Property has access to all municipal utilities, including water, sewer and gas, and is bisected by power lines running from an SCE&G sub-station located directly across Parker Drive from the Property. Tr. at 40:9-22.

---

[2] In 2013, the Landowners listed the Property for sale for $45,000 per acre; however, the Property was not listed for sale at the time of the taking. Tr. at 31:23-25, 214:1-6.

The Property consists of two parcels totaling 536.55 acres. Tr. at 29:8-12. Landowners' Ex. 14 at 11. The first parcel is zoned S-1 industrial (the "Industrial Parcel") and, at 446.33 acres, is one of the largest industrially-zoned tracts of land in Beaufort County. Tr. at 29:8-12, 92:9-13, 485:21-486:1, 534:10-14; Statler Dep. at 90:21-91:2. The Government's permanent restrictive easement covers 179 acres of the 446.33 acres of the Industrial Parcel. Landowners' Ex. 4 at Schedule C. The second parcel totals 90.22 acres and is zoned T2R residential (the "Residential Parcel").[3] Tr. at 486:5-11. The Government's permanent restrictive easement covers all 90.22 acres of the Residential Parcel. Landowners' Ex. 4 at Schedule C. The Industrial Parcel's S-1 zoning classification permits a multitude of uses, including light and heavy manufacturing, while the Residential Parcel's T2R zoning classification primarily permits residential home sites with densities of one house per every three acres. It also allows for farming uses. Tr. at 485:25-486:4, 486:20-21. The Property sits within the MCAS's Airport Overlay (the "Overlay"), which is an additional county zoning classification that applies to all properties near the MCAS that underlie certain noise zones and all properties located in an accidental potential zone.[4] Tr. at 487:7-10. Lieutenant Colonel Philip Williams, a witness for the Government, testified regarding the jets' flight patterns, which have been the same for many decades and which go over a portion of the Property. Tr. at 465:18-459:8.

Across the street from the Property, Parker Drive is lined with industrial properties and businesses, the majority of which are operational and several of which contain newly constructed

---

[3] It is possible that the Residential Parcel could be re-zoned to industrial in the future. Tr. at 538:9-539:11; Government's Ex. 1 at 51.

[4] Most of Beaufort County, particularly northern Beaufort County, is impacted to some extent by jet noise from the MCAS and both appraisal experts agreed that the Overlay had no impact on the value of industrial properties or on the sales price of residential properties within the Overlay. Tr. at 43:2-16, 122:10-21, 535:23-536:18; Government's Ex. 1 at 91. Similarly, both Parcels are minimally impacted, if at all, by their location in an accident potential zone. Tr. at 123:7-23; Government's Ex. at 91.

or re-furbished buildings. Tr. at 37:4-39:25, 40:24-41:25. There are also several residential areas and government buildings surrounding the Property. Tr. at 42:6-18. The Beaufort Commerce Park (the "Commerce Park") sits behind the Property and is connected to Parker Drive by an access road. Tr. at 41:1-2.

Historically, the Property has been used for farming, timber harvesting, surface mining, and recreational hunting. Tr. at 30:7-16, 34:21-23, 201:5-17, 283:7-11. The Landowners have held on to the Property over the years because of its potential for future industrial and residential development. Tr. at 33:1-4. There is limited mining potential on the Property and, in 2015, the Landowners sold one acre of dirt from the Property for approximately $34,000. Tr. at 34:21-23, 283:12-284:12, 306:4-11. No evidence was presented to suggest that the mining value would be any higher than fill dirt. Other viable uses of the Property also existed prior to the taking, such as its use for possible solar development. Tr. at 33:10-17; 34:6-10, 186:23-187:23. Prior to and at the time of the taking, the Landowners were undergoing negotiations with Southern Current, a solar developer, for the placement of a large, utility-scale solar development on the Property. Tr. at 187:3-7. The Landowners have also received interest from other solar developers in building a solar project on the Property. Tr. at 187:7-11. The Property is uniquely well-suited for solar development because it consists of large, contiguous tracts, which allows for flexibility and maneuverability in the layout, and is next to a substation that has little congestion on it. Tr. at 40:9-14, 222:13-20. With upgrades, the Property could have supported a large utility-scale solar project utilizing a high-capacity transmission connection. Tr. at 221:3-15, 235:15-239:11. The interim use of the Encumbered Property for solar development would have produced a substantial revenue stream to the Landowners and allowed them the flexibility to hold the

5

Property until such time as market conditions ripened or to sell the Property subject to the solar leases. Tr. at 188:3-4, 188:9-12, 306:17-25.

## The Easement

It is undisputed that the easement is extremely restrictive and will encumber the land in perpetuity, even if the MCAS were to close at some point in the future. Tr. at 107:17-20, 110:1, 388:7-9, 428:8-10, 532:19-22. Under the terms of the easement, the Government has the absolute discretion to forbid, in perpetuity, any activity or use of the Encumbered Property that it deems to be inconsistent with the easement's purposes, including: (1) "limit[ing] the use and development of [the] [Encumbered Property]"; (2) "prohibit[ing] residential development" of the [Encumbered Property]; (3) allowing "low and frequent flights" over the [Encumbered Property]; and (4) "prevent[ing] any improvement, development or use of the [Encumbered Property] that would otherwise be incompatible with the military mission of [the MCAS] Beaufort." Tr. at 428:2-20, 434:18-23; Landowners' Ex. 4 at Schedule E. Although the easement contains a list of restricted uses of the Encumbered Property, it further states that the list in no way limits the "generality" of the easement's restrictions or the Government's discretion to deny any use of the Encumbered Property as inconsistent with the easement's purposes. Landowners' Ex. 4 at Schedule E.

The easement expressly forbids or restricts the following activities and uses:

> (1)     any activity, development, or use that would interfere, limit, or otherwise be incompatible with "military air operations and the mission of [the MCAS]";
>
> (2)     human habitation, including temporary accommodations such as trailers, RVs, and tents;
>
> (3)     the construction or installation of any structure, building, antenna, tower, wire, or other man-made obstruction, except as necessary to an allowed use of the Encumbered Property, but subject to the Government's approval and authority to deny such use or activity;

6

(4)     any use of the Encumbered Property which would "unnecessarily" attract birds or waterfowl, including growing vegetation or conducting activities attractive to flocks of birds or waterfowl;

(5)     the construction, installation, alteration or growing of any structure, building, antenna, tower, wire, tree or other obstruction of any kind that is taller than 120 feet;

(6)     the location of any structure, except fencing, within 50 feet of the property line abutting [the MCAS];[5]

(7)     any direct or indirect lighting emitted above the horizontal plane;

(8)     subdivision of the Encumbered Property;

(9)     activities of any type that produce smoke, glare, or any visual hazard, except that certain controlled burns are permitted, but subject to notice requirements and the Government's authority to deny such activity; and

(10)    recreational activities, including but not limited to hunting, that are for-profit, that require surface alteration or other development of the land, or that "encourage the assemblage of groups larger than ten (10) persons."

Landowners' Ex. 4 at Schedule E.

The easement expressly permits the following uses subject to the notice requirements[6]

contained in the easement and the Government's approval authority:

(1)     agricultural uses of the Encumbered Property, provided however that crops or vegetation attractive to birds or waterfowl are prohibited, as are trees that are taller than 120 feet;

---

[5] At trial, the Landowners contended that this setback affected approximately six-to-eight acres of the Industrial Parcel not subject to the easement. Tr. at 58:18-21, 59:13-21, 197:24-198:8. The Government's witness, Cassandra Norris, testified that the setback only applies to property abutting the MCAS, and thus does not apply to the subject Property. Tr. At 410: 8-411.5

[6] The easement requires a 90-day notice and application period (the "Government's Notice Requirement"), whereby the Landowners must submit written notice "to the United States" any time they plan to undertake construction or a new use of any kind. Landowners' Ex. 4 at Schedule E. The notice must contain sufficient information and detail for the Government to determine whether the proposed activity or use is consistent with the terms and purpose of the easement. *Id.* The Government shall grant or withhold its approval within 60 days of receipt of the request if upon a reasonable determination by the United States, the proposed activity or use is deemed to be inconsistent with the easement's restrictions or incompatible with its purpose. *Id.*

(2)     feeding and housing a small number of farm animals;

(3)     exploitation of the Encumbered Property's natural resources, provided however that trees that are taller than 120 feet are prohibited;[7]

(4)     wildlife management;

(5)     "naturally occurring water features";

(6)     "undeveloped or raw land";

(7)     the establishment of retention or detention ponds or impoundments to ameliorate storm water runoff, provided however that such impoundments do not attract a concentration of birds; and

(8)     such other uses as may be approved and authorized in writing by the sic_____(presumably the words United States were inadvertently omitted in the easement) provided such uses are not inconsistent with the Purposes of this Easement.

Landowners' Ex. 4 at Schedule E.

Under the terms of the easement, the Landowners retain all responsibilities and must bear all costs and liabilities "of any kind related to the ownership and maintenance of the [Encumbered Property]." Landowners' Ex. 4 at Schedule E. In other words, the Landowners must pay taxes on the Encumbered Property, manage the Encumbered Property, maintain insurance on the Encumbered Property, protect the property, and ensure compliance with the terms of the easement at their own expense, among other potential costs and responsibilities. Tr. at 50:20-24, 400:9-10.

Cassandra Norris testified that, in her position with the Navy, she is tasked with managing and enforcing this easement. Tr. at 418:10-419:4. On cross-examination, she testified to the following:

---

[7] The Government's witness, Cassandra Norris, testified that, under this provision of the easement, the Landowners would have to seek approval from the Navy if there was going to be any mining activity on the Encumbered Property. Tr. at 429:7-15.

Q.  And what came across to me in your testimony, and correct me if I'm wrong, is that pretty much anything that happens on [the Encumbered Property], one way or the other, the Navy has to approve it.

A.  If it involves construction or new use, the Navy needs to approve it.

Tr. at 428:15-20. To this end, Norris has sole discretion to decide what uses are permitted under the terms of the easement, including whether or not to approve or deny any construction or new use of the Encumbered Property by the Landowners. Tr. at 428:6-20, 431:17-20, 434:18-23. For example, when questioned by the Commission regarding the Landowners' proposed use of the Encumbered Property for solar development, Norris testified that:

Q:  But you alone make the decision as long as you have the job.

A..  As long as I have the job, yes.

Tr. at 438:22-24. As the easement extends in perpetuity, Norris' successor likewise will have the sole ability to interpret the easement, even if that interpretation differs from that of Norris. Tr. at 428:6-14. In other words, as a practical matter absent a clearly wrongful determination by a single Naval employee, the Landowners' proposed uses of the Encumbered Property, if not absolutely clearly delineated in the easement, can only be pursued at the discretion of a single Naval employee. Obviously, the Landowners' can seek redress in Federal Court if there is a wrongful determination but this is time consuming and can be extremely costly and often it results in opportunities simply disappearing and going elsewhere. Who would want to deal with who may have to seek permission from a third party who is the United States Government.

## The Value of the Property Pre-Taking

### (1) The Landowners Appraiser's "Before" Valuation:

Thomas F. Harnett, duly qualified as an appraisal expert at trial, testified regarding the fair market value of the taking. Tr. at 88:20-89:3.[8] Harnett opined that, prior to the imposition of the permanent restrictive easement, the Property was worth $8,926,600 (or $20,000 per acre) with respect to the Industrial Parcel and $1,669,070 (or $18,500 per acre) with respect to the Residential Parcel, for a total "before" value of $10,595,670. Tr. at 90:20-91:1; Landowners' Ex. 14 at 39, 44. Hartnett determined the fair market value of the Property using the sales comparison approach.[9] Tr. at 92:8-9; Landowners' Ex. 14 at 21. He further testified that he determined that the highest and best use of the Property prior to the taking was for it to be held for future development consistent with the parcels' zoning classifications—that is, industrial development for the Industrial Parcel and residential development for the Residential Parcel. Tr. at 139:17-20, 140:9-11.

With respect to the Industrial Parcel, Hartnett testified that, because there are so few industrial properties of this size in Beaufort County, there were no recent arms-length sales that were comparable in that area. Tr. at 92:8-18. Therefore, Hartnett analyzed three land sales in

---

[8] Hartnett is a real estate appraiser with more than fifty years of experience, who has appraised properties in thirty-two of South Carolina's forty-six counties. Tr. at 87:13-88:11. He has appraised numerous properties in Beaufort County and testified that he was very familiar with property values in the area. Tr. at 98:19-99:6, 107:12-16.

[9] The sales comparison approach to real estate appraisal is based on three assumptions: (1) there is a market for a particular property; (2) that both the buyer and seller are fully informed as to the property and the state of the market for that type of property; and (3) that the property would be exposed to the market for a reasonable amount of time. Landowners' Ex. 14 at 33. The application of this approach produces an estimate of value for property by comparing it with similar properties that have recently sold or are currently being offered for sale in the same or competing market areas. *Id.* The sales prices of properties judged to be the most comparable tend to set a range within which the value of the subject property will fall. *Id.* Further examination of the data should lead to a logical indication of the subject's most probable selling price. *Id.*

Berkeley County and one land sale in Charleston County. Tr. at 92:18-20. All four sales involved undeveloped, industrial land and occurred between 2014 and 2016. Tr. at 92:23-93:25; Landowners' Ex. 14 at 38. The sales ranged in size from 57 to 223 acres and in value from $32,500 to $80,500 per acre (approximately). Tr. at 92:23-93:25; Landowners' Ex. 14 at 38. Harnett testified that he adjusted these values downward by between 15 to 43% to account for their smaller size[10] and by between 20 to 35% for their superior location,[11] resulting in a mean adjusted value of $20,075 per acre. Tr. at 95:6-12; Landowners' Ex. 14 at 39. He testified that this is how he reached the "before" value of $20,000 per acre for the Industrial Parcel. Tr. at 95:13-16.

With respect to the Residential Parcel, Hartnett selected as sales comparables three undeveloped, residential land sales in Beaufort County that occurred between 2014 and 2015.[12] Landowners' Ex. 14 at 43. They ranged in size from 21 to 59 acres and in value from $14,000 to $55,000 per acre (approximately). Landowners' Ex. 14 at 43. As with the industrial comparables, Hartnett made downward adjustments to these values by between 0-25% for location and by between 10-28% to account for size, which analysis resulted in a mean adjusted value of $19,856. Landowners' Ex. 14 at 43. Hartnett testified that the Residential Parcel's one-house-per-three-acres zoning designation made little difference regarding the Parcel's per-acre

---

[10] With respect to the size adjustments, Hartnett testified that, all things being equal, larger parcels carry smaller per-acre units of value and smaller parcels carry larger per-acre units of value. Tr. at. 94:22-24. Therefore, adjustments must be made to account for differences in size. Landowners' Ex. 14 at 38. Hartnett further testified that he made his size adjustments based on the Dilmore Size Adjustment Chart, which has been employed by real estate appraisers for many years and which, in Hartnett's experience, has proven to be accurate. Tr. at 95:1-5.

[11] With respect to the location adjustments, Harnett testified that Berkeley County was a 20% better location than Beaufort County, and that Charleston County was a 35% better location than Beaufort County. Tr. at 94:19-22.

[12] One of the sales was zoned industrial at the time of sale. Landowners' Ex. 14 at 42. However, Hartnett's research indicated that the property had been purchased for the purpose of placing a conservation easement on it and, thus, it could not be developed. *Id.* Therefore, Hartnett included this sale in his valuation analysis for the Residential Parcel. *Id.*

value and that $55,000 for a three-acre residential lot is a "steal" in Beaufort County. Tr. at 110:14-22, 133:23-134:8. He thus valued the Residential Parcel at $18,500 per acre, prior to the imposition of the permanent restrictive easement. Tr. at 95:17-24; Landowners' Ex. 14 at 44.[13]

### (2) The Government's "Before" Valuation:

Haywood F. Newkirk, a real estate appraiser from Wrightsville Beach, North Carolina, was duly qualified as an expert in real estate appraisal for the Government. Tr. at 475:8-16. Newkirk valued the Property, prior to the taking of the permanent restrictive easement by the Government, at $3,200,325 (or $7,500 per acre) with respect to the Industrial Parcel and $402,960 (or $4,800 per acre)[14] with respect to the Residential Parcel, for a total "before" value of $3,603,285.[15] Tr. at 520:15-18, 524:21-22; Government's Ex. 1 at 103, 108. Like Hartnett, Newkirk also applied the sales comparison approach and determined that the highest and best use of the Industrial Parcel was for it to be held for industrial development.[16] Tr. at 479:15-19, 505:13-16, 505:25-506:2; Government's Ex. 1 at 95. With respect to the Residential Parcel, however, he determined that the highest and best use was for residential use along the road front

---

[13] Batson, a Government witness, provided expert testimony that was limited to critiquing Hartnett's appraisal report. Tr. at 384:24-385:1. While Batson agreed with the methodology employed by Hartnett to value the Property in the "before," and commended the sizable downward adjustments that Hartnett applied to his sales comparables, he was critical of the presentation of Hartnett's analysis in appraisal report. Government's Ex. 3 at 52. Because of the limited scope of his testimony, Batson did not offer any opinion of value for the Property, but indicated that this was a "hard appraisal." Tr. at 340:20-341:3, 382:3-5, 384:21.

[14] With respect to his calculation of the "before" value of the Residential Parcel, Newkirk testified that there are approximately six acres of wetlands on this parcel, and, therefore, that he only accounted for 83.950 upland aces in his "before" valuation. Tr. at 525:13-17.

[15] In preparing his appraisal report, Newkirk used an appraiser from Maryland. Tr. at 477:8-479:14; Government's Ex. 1 at 5. Although Newkirk was unaware of whether the Maryland appraiser had ever appraised any property in South Carolina, the Maryland appraiser performed a significant amount of work on Newkirk's appraisal report. Tr. at 477:8-479:14, 534:5-9; Government's Ex. 1 at 5.

[16] In reaching his value conclusion, Newkirk did not consider the mining potential of the Property. Government's Ex. 1 at 66. He reserved the right to revise his appraisal if he determined that there were valuable soils or minerals on the Property. Tr. at 535:4-10; Government's Ex. 1 at 66.

only, with supporting agricultural or recreational uses for the remaining acreage. Government's Ex. 1 at 96.

With respect to the Industrial Parcel, Newkirk identified four sales of industrial properties as comparables for purposes of calculating its pre-taking value.[17] Tr. at p. Government's Ex. 1 at 102. He chose not to give any weight to the property with the highest value per acre and which required the least amount of adjustments.[18] Tr. at 517:14-16, 539:25-540:11. Of the three remaining industrial sales, two of them were sales under unusual circumstances. The first such sale involved a private developer seller who was "very motivated to sell" the property, which he had owned for eleven years without breaking ground, due to the impending expiration of multiple permits, including wetlands permits. Government's Ex. 1 at 126. Newkirk also relied on the sale of the entire Commerce Park in 2012 to the City of Beaufort by the bank that had purchased it in a foreclosure auction. Tr. at 542:12-543:24. Moreover, Newkirk applied a substantial downward adjustment of 36%, despite his acknowledgment that the Property has superior frontage and topography.[19] Tr. at 520:3-5, 542:21-543:4.

---

[17] Two of Newkirk's industrial comparables were located in Beaufort County. Government's Ex. 1 at 99-101. The remaining two were located in the Savannah and Charleston sub-markets. *Id.* The comparable sales took place between 2012 and 2016, ranged in size from 45 to 322 acres (approximately), and ranged in sales price from $11,100 to $18,100 per acre (approximately). Government's Ex. 1 at 102.

[18] As testified to by Batson, the Government's own rebuttal expert, generally the comparable with the least amount of adjustments should be given the most weight. Tr. at 390:23-391:3.

[19] The Government also presented testimony from Kimberley Statler, who was formerly employed with the Lowcountry Economic Alliance (the "Alliance"), prior to its dissolution in 2015. Statler Dep. at 7:22-8:2, 9:17-25, 34:10-16. Statler testified that Beaufort County's industrial market is small and that there are few industrially zoned properties in the area. Statler Dep. at 22:17-23:4. She also testified that, in her experience, typical industrial users in Beaufort County are light industrial. Statler Dep. at 23:20-23. While employed by the Alliance, Statler evaluated the possibility of acquiring the subject Property and developing it as an extension of the Commerce Park. Statler Dep. at 38:6-39:9, 76:7-12, 80:11-14.

13

With respect to the Residential Parcel, Newkirk identified three sales of residential properties in Beaufort County as comparables for purposes of calculating its pre-taking value.[20] Government's Ex. 1 at 105-107. The first residential sale consisted of 101 acres (approximately) and sold in 2014 for $3,953 per acre, but was never listed on the open market. Tr. at 521:25-522:20, 547:15-18; Government's Ex. 1 at 105-106. Therefore, Newkirk made an upward adjustment of 11% to account for the fact that there were no brokerage fees or holding costs involved, resulting in an adjusted value of $4,387 per acre. Tr. at 521:25-522:23. Newkirk also used a five-acre residential sale (approximately), which sold for $5,847 per acre in 2016. Tr. at 522:24-523:3; Government's Ex. 1 at 106-107. Newkirk applied a downward adjustment of 37% for size and 5% due to its location outside of a noise zone. Tr. at 523:4-12; Government's Ex. 1 at 106. Newkirk used a third residential sales comparison from 2015 of 23 acres (approximately), which sold for $5,258 per acre. Tr. at 524:4-8; Government's Ex. 1 at 106-107. Newkirk made a downward adjustment of 5% to account for its location outside of a noise zone.[21] Tr. at 524:9-11; Government's Ex. 1 at 106-107. However, he also testified that, while the noise zones may have some impact on the number of days that a property is on the market, they have no impact on a property's value or sales price. Tr. at 536:2-18.

_____

[20] Newkirk testified that Clarendon Plantation is located near the Property and is subject to a conservation easement. Tr. at 550:9-14. He testified that, thus, much of the adjacent residential property cannot be developed for residential use. Tr. at 549:17-14.

[21] The per-acre value utilized by Newkirk treated the property as though it did not contain any wetlands. Tr. at 524:4-8. The National Wetlands Survey indicates that approximately half of the property's acreage is wetlands. Tr. at 548:9-549:1. Had they been accounted for in the calculation of the per-acre value of the property, its value-per-upland-acre would have nearly doubled. Tr. at 549:2-4.

## The Value of the Property Post-Taking

### (1) The Landowners' "After" Valuation:

The Landowners presented evidence that the post-taking value of the Encumbered Property is between 0 and 25% of its pre-taking value. Tr. at 50:1-24, 196:22-197:5, 286:8-16; 91:12-14, 91:19-20. They also presented evidence that the remaining portion of the Industrial Parcel that is not subject to the easement (approximately 267.33 acres) was devalued by at least 20% of its pre-taking value. Tr. at 51:25-52:16, 58:10-14, 80:7-21; 197:6-11.

All three Landowner Witnesses testified to their opinion that the Government's imposition of the permanent restrictive easement on the Encumbered Property in essence amounted to a total taking of their property rights. Tr. at 50:11-15, 197:4-5, 286:9-12. Specifically, they testified that there are no viable uses of the Encumbered Property remaining and, therefore, it has no post-taking value. Tr. at 49:5-51:11, 194:22-195:8, 197:1-5, 284:19-22, 285:7-20, 286:8-16, 303:20-304:6, 306:9-16. Moreover, because, under the terms of the easement, the Landowners retain all responsibilities, costs and liabilities of ownership, they testified that the Encumbered Property post-taking is actually a burden, with none of the benefits of ownership. Tr. at 50:20-24, 286:11-13.

The Landowner Witnesses testified that there are no viable remaining uses of the Encumbered Property because it cannot be developed. Tr. at 49:9. There cannot be any structures on the Encumbered Property, not even a temporary structure such as a tent. Tr. at 49:9-12. Farming activities involving seeds are prohibited because attracting birds is prohibited under the easement; farming activities involving plowing are prohibited because activities that create dust are prohibited under the easement. Tr. at 49:13-15. The Encumbered Property cannot be leased for any recreational activities, such as fishing or hunting, because all

15

recreational activities must be not-for-profit under the easement. Tr. at 51:1-11. Moreover, the easement prohibits any type of bird or waterfowl hunting. Tr. at 286:13-14. The Landowners cannot mine the Encumbered Property because the easement prohibits alterations in the natural state and grading of the land, and because the resulting water impoundments could attract birds or create glare. Tr. at 49:15-18, 284:19-285:3. The Landowners cannot grow trees on the Encumbered Property which reach a height of more than120 feet, Tr. at 285:15-16, and any and all controlled burns of timber must abide by the Notification and Approval procedures of the Easement. Notably, controlled burns are allowed but must be conducted when conditions are optimal, Tr. at 303:20-23. It was noted that the Landowners could not have a family reunion on the Encumbered Property because the easement limits the number of people who may be on the Encumbered Property to no more than ten. Tr. at 49:19-25. The property cannot even be used as a cemetery because of the ten (10) person limitation. Unless of course, the rules of the cemetery required a limitation of no more than ten (10) persons who could pay respect to the sacred dead. Obviously, such a restriction would in practicality prohibit its use as a cemetery.

Furthermore, the Government has denied the Landowners' intended use of the Encumbered Property for a solar farm as violate of the easement's restriction on glare. Tr. at 194:22-195:8; Landowners' Ex. 19 at 2. While the Government proffered testimony that solar uses of the Encumbered Property would have been prohibited prior to the imposition of the restrictive easement under the County's Overlay zoning, the Landowners' solar expert, Gregory Ness, testified that the solar project on the portion of the Industrial Parcel unencumbered by the easement has been approved with respect to any glare issues. Tr. at 246:11-14, 337:24-338:1, 525:24-526:1. Thus, while the solar use of the Encumbered Property was denied by the Navy as prohibited by the easement, the solar use of the unencumbered Industrial Parcel was approved

16

because, according to Norris' testimony, such approval on the unencumbered Parcel "has nothing to do with compliance on the easement." Tr. at 431:1-5.

Landowners also testified that because any use that they might make of the Encumbered Property other than specifically permitted uses is now subject to review and approval by the Government, and the Government has the discretion to deny any such approval as either expressly prohibited under the easement or as "inconsistent with restrictions of [the] [e]asement or incompatible with the [p]urpose of [the] [e]asement," there has been a total taking of the Encumbered Property. Tr. at 50:1-2, 50:11-14, 285:7-13, 286:14-15, 303:25-304:6; Landowners' Ex. 4 at Schedule E.

Finally, the Landowners testified that the remainder of the Industrial Parcel that is not subject to the permanent restrictive easement has been devalued by at least 20% of its "before" value because the easement is taking approximately 80% of the Property's road frontage and the Property's superior road frontage was recognized by the appraiser witnesses as a key factor for the Property's superiority over other industrial sites. Tr. at 51:25-52:16, 58:10-14, 80:7-21; 197:6-11.

Hartnett stated in his report that, in his experience, the value of land encumbered by an easement, assuming that it can still be used for some purposes, generally ranges anywhere from 25 to 40% of the value of the land as if unencumbered. Landowners' Ex. 14 at 46. He testified that this *was the most restrictive easement that he had ever seen* (emphasis added) and that he therefore de-valued the Encumbered Property in the "after" by 75%, which was the largest percentage within that typical range for easements. Tr. at p. 91:12-14, 91:19-20, 107:17-20, 110:1. However, Hartnett also testified that he had to strain to find that the Encumbered Property retained 25% of its value because he felt it had very little if any value left after the

17

imposition of the easement. Tr. at 107:25-108:5, 110:1-3. He further testified that he believed that it was unreasonable to conclude that the Encumbered Property had no remaining value and that the imposition of the permanent restrictive easement amounted to a total taking. Tr. at 108:14-17. Thus, while his value conclusion utilized a 25% remaining value for the Encumbered Property, he testified that "[he would] almost have to agree with [the Landowners] that there's very little, if any, value left."[22] Tr. at 110:1-3. Notably however on Cross Examination John Trask noted several years before the placing of the Easement they planted 50-100 acres of parcel one in trees and almost all of parcel two. Tr. at 201:23-25 and 202:1. Presumably this was done to make money.

Hartnett testified that he did not use comparable sales to value the Encumbered Property in the "after" because the wording of easements varies greatly and that such variations have a significant impact on the remaining value of a property. Tr. at 182:20-183:1. Hartnett, for example, testified that property encumbered by an easement with less restrictive language will have more value than a property encumbered by a more restrictive easement. It is not always possible to use comparable sales to value a property covered by an easement. Tr. at 183:1-4. Hartnett did not find any comparable sales of property containing restrictive easements similar to the easements placed on the Encumbered Property. Tr. at 182:7-9, 183:12.

**(2) The Government's "After" Valuation:**

Newkirk testified that the highest and best use of both the Industrial and the Residential Parcels after the imposition of the restrictive easement is as recreational tracts. Tr. at 527:19-22. Therefore, Newkirk applied the comparative sales method using sales of recreational tracts and

---

[22] Hartnett testified that, if the Commission agrees that the Encumbered Property has no remaining value, just compensation for the Encumbered Property could be calculated by multiplying his "before" value per ace ($20,000 per industrial acre and $18,500 per residential acre) by the total amount of acreage taken (179 acres and 90.22 acres, respectively). Tr. at 110:5-10.

concluded that the Encumbered Property was now worth $3,000 per acre. Tr. at 527:16-18, 530:15-19.

Newkirk utilized four land sales as the basis for his "after" valuation. Tr. at 527:23-528:2; Government's Ex. 1 at 121. Of those four sales, three were hunting properties that he concluded were superior to the Property because of their excellent waterfowl hunting.[23] Tr. at 528:14-529:9. While he applied a downward adjustment of 30% to these sales to account for their superior waterfowl hunting, he did not address or account for the many other ways in which the Encumbered Property, in contrast to these properties, is restricted by the easement. Tr. at 182:12-183:11, 552:24-553:19.

Finally, Newkirk testified that the easement did not impact the value of the remaining industrial land not subject to the easement even though the easement took the majority of the road frontage because there was still adequate road frontage remaining to support an industrial use of that property. Tr. at 526:10-16.

### III. CONCLUSIONS OF LAW

The sole issue for determination before the Commission is the appropriate amount of just compensation owed to the Landowners for the Government's taking of the permanent restrictive easement on the Encumbered Property. Any findings of fact contained in the Conclusions of Law are incorporated into and deemed to be Findings of Fact.

The Landowners have a constitutional right pursuant to the Fifth Amendment to the United States Constitution to just compensation for the taking of their property. U.S. Const. amend. V. "[T]he standard upon which compensation is based is 'market value,' what it fairly may be believed that a purchaser in fair market conditions would have given." *United States v.*

---

[23] Newkirk testified that one such property was the nicest hunting property that he had ever seen. Tr. at 528:10-11.

19

*Miller*, 317 U.S. 369, 374 (1943). "In arriving at market value, there should be taken into account all considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy." *U.S. v. Carroll*, 304 F.2d 300, 306 (4th Cir. 1962). "The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *Miller*, 317 U.S. at 373. If only part of a landowner's property is taken, "the owner is not confined to recover for the part taken only, but is entitled to recover also for the damages thereby visited upon the area remaining in his title, possession and use." *U.S. v. 97.19 Acres of Land, More or Less, in Montgomery, Washington and Alleghany Counties, Md.*, 582 F.2d 878, 880 (4th Cir. 1978) (citation and internal quotation marks omitted).

### (1)  The "Before" Value.

At trial, Mr. Hartnett testified that the before valuation of Parcel 1 Industrial Property was $20,000 per acre and, thus, that the fair market value of Parcel 1, the Industrial Property prior to the imposition of the Government's easement was $3,580,000. We find Mr. Hartnett's testimony and appraisal report to be persuasive and agree with Mr. Hartnett and find that the value of Parcel 1 prior to the imposition of the permanent restrictive easement is $3,580,000 ($20,000 per acre for 179 acres). Mr. Hartnett further testified that the before valuation of Parcel 2 prior to the imposition of the Government's easement was $1,669,070. We agree with Mr. Hartnett and find his testimony and appraisal report of Parcel 2 persuasive and that the value of Parcel 2 prior to the imposition of the permanent restrictive easement is $1,669,070 for the 90.22 acres in Parcel 2.

The Commission finds the defense presentation, comprised of the Landowners' expert's opinions, and accompanying evidence of the pre-taking value of the Property to be compelling.

20

"[T]he opinion testimony of a landowner as to the value of his land is admissible without further qualification.... Such testimony is admitted because of the presumption of special knowledge that arises out of ownership of the land." *U.S. v. 329.73 Acres of Land, Situated in Grenada and Yalobusha Counties, State of Miss.*, 666 F.2d 281, 284 (5th Cir. 1982). The Commission finds no supportable basis for the Landowners' opinion of value. We agree that the Property is a good site with few or no wetlands and excellent road frontage and, with respect to the Industrial Parcel, that it is a unique property in Beaufort County by virtue of its size, absence of wetlands, and proximity to downtown Beaufort. The evidence is compelling that Beaufort County is one of the fastest growing counties in South Carolina and the Commission finds that, as of the date of the taking, the market for industrial and residential property in Beaufort County was improving and was likely to continue to improve in the reasonably near future.[24]

The Commission finds that there were viable, interim uses of the Property, such as for solar development or surface mining, and that such uses of the Property enhanced the market value of the Property as a whole because they are factors that impact the price that a willing buyer would have been willing to pay for the Property. *See U.S. v. Carroll*, 304 F.2d 300, 306 (4th Cir. 1962) (holding that it was proper for the commission to consider the existence of sod as a factor possibly affecting the determination of the market value of the property as a whole when put to its highest and best use). *See also U.S. v. Smith*, 355 F.2d 807 (5th Cir. 1966) (holding that, in determining market value of property taken, consideration should be given to all facts

---

[24] Although Statler argued that the industrial market was stagnant in Beaufort County, her testimony is of little probative value with respect to the Property because her relevant experience with the Beaufort County industrial market occurred in the years following the Recession and, thus, is not indicative of the market on the date of the taking. In fact, Statler acknowledged that "[she] knew the market was turning." Tr. at 32:24-33:3. Moreover, Statler's testimony focused on the expansion of the Commerce Park. Thus, her testimony does not provide insight into the value or viability of a potential sale of the Property to a large industrial developer.

and circumstances that would reasonably go into the making of the purchase and sale bargain between a willing buyer and willing seller).

The Commission further finds that Hartnett gave the more compelling expert testimony as to the "before" value of the Property.[25] The Commission finds that, given the unique nature of the Industrial Parcel, it was reasonable for Hartnett to utilize industrial properties in Berkeley and Charleston Counties for valuation purposes, particularly in light of the substantial downward adjustments that he made for size and location. While the Government criticized Hartnett's selection of comparables in these markets, Newkirk was only able to identify two industrial properties in Beaufort County as comparables. In reaching his "before" value conclusion of the industrial parcel, he rejected the comparable sale with the highest valuation, even though it had the least amount of adjustments.

With respect to the Residential Parcel, the Commission is further persuaded by Hartnett's testimony that the density classification of the Property has little impact on it's per acre value. Hartnett used his extensive experience and familiarity with property values in Beaufort County as a check of reasonableness and determined that $18,500 per acre for three acres of residential property is well within market value for residential tracts in Beaufort County. Furthermore, the Commission is not persuaded by Newkirk's determination that the highest and best use of the Residential Parcel is for one-to-three home sites on the entire 90-acre parcel. As a result, the

---

[25] The Commission finds the Government's attempt to discredit Hartnett's testimony to be unpersuasive. Batson was retained for the express purpose of criticizing Hartnett's appraisal, but did not develop a valuation opinion of his own. Furthermore, although Batson was critical of the presentation of Hartnett's report, he agreed with the methodology employed by Hartnett to value the Property in the "before," and commended the sizable downward adjustments that Hartnett applied to his sales comparables. While Batson also criticized Hartnett for not utilizing comparable property sales to value the Property in the "after," Batson did not actually offer any such comparable sales.

Commission finds the size adjustments applied by Newkirk to his residential comparables are inappropriate.

At trial, the Government relied heavily on the purported lack of demand for the Property in its valuation. Through Statler's testimony, the Government pointed to the entitlements and slow historical growth of the Commerce Park as evidence that there is no demand for the Property. On this basis, Newkirk utilized "before" sales comparables that suffered from a lack of demand and that were, in some instances, distressed sales. This approach is of little probative value because of the unique nature of the Property and because of the specific facts and circumstances surrounding the Commerce Park. The Commerce Park is comprised of many, smaller tracts and could not accommodate a large industrial user requiring two-hundred or more acres, which Statler testified is the smallest tract that large industrial users seek to purchase. The Government also argued that the Residential Parcel suffered from a similar lack of demand based on evidence that there was more residential development happening in other areas of Beaufort County. This argument ignores the fact that much of the land adjacent to the Property is subject to conservation easements and, thus, is unavailable for residential development and in fact arguably enhances the Landowner's residential tract.

The Landowners presented evidence that the City of Beaufort is valuing internal lots at the Commerce Park at $30,000-$35,000 per acre and that the recent sale to Oliver's Bush-Hogging sold below market price due to its relationship with the Commerce Park. *See United States v. 312.50 Acres of Land, More or Less, Situated in Prince William Cty., Com. of Va.*, 812 F.2d 156, 157 (4th Cir. 1987) (holding that post-taking contracts of sale are admissible to show value). However, the Commerce Park lots are smaller lots and come with some entitlements, and the Property is a superior property in most respects. Specifically, while the Property has

substantial road frontage and access, the Commerce Park sits behind the Property with almost no road frontage and is connected to Parker Drive only by a narrow access road. Unlike the Property, which is high and dry, the Commerce Park also has wetlands issues. The lack of wetlands combined with the larger size of the Property allows industrial users greater flexibility and may well lower the cost of infrastructure, such as roads and utilities.

Although the Landowners make some notable points, the Commission adopts Mr. Hartnett's "before" valuation. Therefore, we recommend that a before value of $20,000 per acre be placed on Parcel 1 and an $18,500/acre value placed on Parcel 2.

### (2) The "After" Value.

The Commission does not agree with the Landowners', the Government's or any of the expert's opinion of the "after" value of the Property and finds that the Encumbered Property has a 9% remaining value after the imposition of the permanent restrictive easement. In particular, the Commission finds that notwithstanding the Notification and Approval provisions of the easement, the ability to grow and harvest timber up to 120' in height has value even though it is somewhat encumbered by the easement. Furthermore, the Commission finds the same to be true for the possibility of mining dirt which has recently been done on a limited basis by the Landowners. The Commission finds that this conclusion is supported by the controlling case law and the weight of the evidence. In the seminal case *Lucas v. South Carolina Coastal Council*, the United States Supreme Court held that a total taking has occurred where the government has deprived the landowner of all economic value of the property. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1031 (1992). The Court reasoned that, where a landowner is forced to leave his property economically idle, he has been deprived of the property itself. *Id.* at 1019. The Government witness Batson argued that property has value "[e]ven if it does nothing but

24

holds the ends of the earth together." Tr. at 392:6-8. However, this view is contrary to the rulings in *Lucas*. Specifically, that landowners' rights are a "bundle of rights" and that, while reasonable Landowners should expect the possibility that their rights may become restricted to some extent from time to time, a total taking of the landowners' rights has occurred where landowners have been deprived of all economically productive or beneficial uses of their land. *Lucas*, 505 U.S. at 1027-30. While there may be value to the public of a property's "holding the ends of the earth together," public value is separate and distinct from economic value. Incumbent in a landowner's bundle of rights is the right to possess and exploit his land. *See U.S. v. Causby*, 328 U.S. 256, 262 (1946) (explaining that landowners' "bundle of rights" includes their beneficial ownership of the property, which is defined as the owners' right to possess and exploit the land). Here, the Government has eliminated much of the economic uses of the Encumbered Property, and the Landowners have been left with the burdens of ownership, with very few of its benefits. The ability to grow and harvest timber has some value, and in fact the testimony shows several years before the Easement the Landowners planted a significant portion (50-100 acres) of parcel one and almost all of parcel two in trees presumably to make a profit. Likewise, the possibility even though limited to mine the property for dirt has some value.

Furthermore, under the *Uniform Appraisal Standards for Federal Land Acquisitions*, for purposes of compensation, opinions of market value must be based upon an "economic highest and best use," which means that the use "must contribute to the property's actual market value, and it must be a competitive supply and demand for that use in the private market." By this standard, the weight of the evidence establishes that the growing and harvesting of timber is an economic use of the Encumbered Property and, thus, is appropriate for consideration in determining the "after" value of the Encumbered Property. Likewise, the possibility of mining

dirt is an economic use of the Encumbered Property, although the Notice and Approval requirements of the easement will make it very difficult.

Having heard the witnesses' testimony and considered all of the evidence, it is clear to the Commission that the Landowners have been deprived of the vast majority of the economic value of the Encumbered Property. In fact, Batson, the Government's own rebuttal appraisal expert, testified that he wondered "why [this] wasn't just a total taking." The argument by the Government that the Encumbered Property has post-taking value as hunting property is unpersuasive. First and foremost, it is undisputed that the Encumbered Property cannot be used for hunting activities that are "for profit" (emphasis added). Moreover, there is simply no evidence that there would be any market demand for the Encumbered Property for hunting waterfowl because it is prohibited under the terms of the restrictive easement, among other restrictions.

Based on the foregoing, we find the Encumbered Property had some limited remaining use after the imposition of the easement. For example, as mentioned the Landowner can grow timber on the Encumbered Property although the Landowner is subject to the 120' height restriction (ample height for saw timber) as well as the Notification and Approval provisions as to burning and construction of logging roads. Likewise, the Notification and Approval process will make it difficult to exploit any mining potential as potential buyers will in all probability simply go elsewhere. Moreover, approval of uses falls to a single Naval employee and will in perpetuity. Finally, all proposed uses require a 150-day notice and approval period requiring the Landowners to make a written application to the Government, which may be denied if it is determined that such use would be "inconsistent with the restrictions of [the] [e]asement or incompatible with the [p]urpose of [the] [e]asement." The Commission finds that the

Government's right to approve or deny any construction on or any new use of the Encumbered Property is a compensable taking and constitutes a deprivation of the Landowners' rights. *See Washington Metro. Area Transit Auth. v. One Parcel of Land in Montgomery Cty., Maryland*, 549 F. Supp. 584, 589 (D. Md. 1982), *aff'd*, 720 F.2d 673 (4th Cir. 1983) (holding that the government's right to review future building plans under the terms of an easement constituted a compensable element of just compensation for the taking, even though the government did not have a right to approve such plans, because there was evidence that the government could nonetheless request the local permitting authority not to issue a building permit if the plans did not meet with the condemning authority's requirements).

Under *Lucas*, and based upon the evidence presented as to the post-taking value of the Property subject to the easement, and the harshness of the restrictive easement, the Government's taking of the permanent restrictive easement requires the Commission to place a value on the Encumbered Property, "after" the placing of the restrictive easement of 9% of the "Before" value of the Encumbered Property, thereby entitling the Landowners to recovery of 91% of the full pre-taking value of the Encumbered Property.

### (3) Damages to the Unencumbered Remainder.

The Commission agrees with the Landowners that the portion of the Industrial Parcel not subject to the permanent restrictive easement has been devalued as a result of the Property's substantial loss of 80% of its road frontage. The Government did not introduce any evidence to refute this. Instead, Newkirk merely testified that he did not believe that there were any damages to the unencumbered remainder because there was still sufficient road frontage for it to be viable for industrial uses. However, a property may still be viable as a use, but nonetheless made less valuable. The evidence establishes that road frontage is a key indicator of value and that some

27

industrial uses will require substantial flexibility of access to the property. Moreover, the remainder is further devalued by its loss of size. The Landowners testified that the unencumbered remainder was devalued by at least 20% as a result of the easement. The Commission does not agree with the Landowners contention that the unencumbered remainder was devalued by 20%. This is because the Landowners still have access to the unencumbered parcel and subject to the Notification and Approval provisions may be able to build a road through the Encumbered Parcel to access the Unencumbered Parcel. The Commission finds a more appropriate devaluation of the Unencumbered Parcel to be 10%. Accordingly, the Commission finds that the remaining 267.33 acres of the Industrial Parcel are devalued as a result of the permanent restrictive easement by 10% of their pre-taking value.[26]

## **FINAL DETERMINATION OF JUST COMPENSATION AND RECOMMENDATIONS**

Having carefully considered all of the evidence,

THE COMMISSION HEREBY MAKES THE FINAL DETERMINATION OF JUST COMPENSATION AS FOLLOWS:

(1)     The Government should pay to the Landowners Three Million, Two Hundred Fifty Seven Thousand, Eight Hundred ($3,257,800.00) Dollars as just compensation for the Encumbered Property (Parcel 1) based upon $20,000.00 per acre for 179.00 acres, with a 9% remaining value;

(2)     The Government should pay to the Landowners One Million, Five Hundred Eighteen Thousand, Eight Hundred Fifty Three ($1,518,853.00) Dollars as just compensation for the Encumbered Property (Parcel 2) based upon $18,500.00 per acre for 90.22 acres with a 9% remaining value.

---

[26] As previously noted, the Commission finds the Industrial Parcel to be valued at $20,000.00 per acre.

28

(3)     The Government should pay to the Landowners Five Hundred Thirty Four Thousand, Six Hundred Sixty ($534,660.00) Dollars for the ten (10%) percent diminution in value to the unencumbered property based upon a pre-taking value of $20,000.00 an acre for the 267.33 acres of unencumbered property;

**THUS, the Government should pay Five Million, Three Hundred Eleven Thousand, Three Hundred Thirteen ($5,311,313.00) Dollars as the total award of just compensation less the drawdown of One Million Ninety One Thousand ($1,091,000.00), or a net award of Four Million, Two Hundred Twenty Thousand, Three Hundred Thirteen ($4,220,313.00) Dollars;**

IN ADDITION, THE COMMISSION RESPECTFULLY MAKES THE FOLLOWING RECOMMENDATIONS:

(1)     That the Government pay the lawful amount of interest on the net award of just compensation from July 15, 2016 to the date of entry of judgment by the U.S. District Court; and

(2)     That U.S. District Judge Richard Mark Gergel conduct an evidentiary hearing with the purpose of awarding attorney's fees and costs to the Landowners, including the costs associated with the trial before the Commission, as the Commission finds the Government's position was not substantially justified and the circumstances entitle the Landowners to an award of attorney's fees and costs.

**IT IS SO ORDERED.**

Respectfully Submitted,

_____
**Stephen A. Spitz**
**Head Commissioner**

_____
**Jean H. Toal**
**Commissioner**

_____
**Alan J. Reyner**
**Commissioner**

Columbia, S.C.
March 14, 2019