IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| United States of America, | ) | Civil Action No. 9:16-2550-RMG |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER AND OPINION** |
| 269 Acres, *More or Less, Located in Beaufort County, State of South Carolina*; *et al.*, | ) | |
| Defendants. | ) | |

Before the Court is the Final Determination of Just Compensation and Recommendation by the Commission (the "Report"). (Dkt. No. 164.) The United States of America (the "Government") filed Objections to the Report (Dkt. No. 172, No. 176) and the Landowners filed a Motion to Adopt the Report (Dkt. No. 174). On March 25, 2019, the Court heard oral arguments on the Government's Objections.

For the reasons set forth below, the Court adopts in part and declines to adopt in part the Report as the Order of the Court. The Court finds the full award of just compensation due to the Landowners is $4,441,410.00. As explained below, the Court therefore orders that the Government pay the Landowners compensation in the amount of $3,350,410.00, in addition to the amount of $1,091,000.00 previously paid in to the Court.

**I.   Background**

The Government filed this action on July 15, 2016 to impose a permanent restrictive easement over 269.22 acres of land (the "Property") located in Beaufort, South Carolina. (Dkt. No. 1.) The purpose of the easement is to restrict development in the flight path of jets in and out of the adjacent U.S. Marine Corps Air Station ("MCAS"). (Dkt. No. 140-1.) On July 22, 2016, the

-1-

Government deposited $1,091,000.00 with the Court as estimated just compensation. (Dkt. No. 1, No. 7.) The sole issue in dispute is the appropriate amount of just compensation due to the Landowners. Pursuant to Rule 71.1 of the Federal Rules of Civil Procedure, the Court appointed a three-person Commission comprised of Stephen A. Spitz, Jean H. Toal and Alan J. Reyner. The Commission conducted a three-day bench trial in August and December 2018 and issued its final Report on March 14, 2019.

The Commission heard extensive evidence relevant to "the character, location, or quantity" of the Property. Fed. R. Civ. P. 71.1(h).[1] The Property, which the Landowners' family has owned in fee simple since 1955, consists of two parcels. One parcel is 446.33 acres zoned S-1 industrial (the "Industrial Parcel"), of which the restrictive easement covers 179 acres. This industrial zoning permits both light and heavy manufacturing. The second parcel is 90.22 acres zoned T2R residential (the "Residential Parcel"), of which the restrictive easement covers all 90.22 acres. This residential zoning permits the development of one house per three acres and farming use. The Property is undeveloped raw land that consists of unusually few wetlands for the Lowcountry. It is bisected by power lines running from an adjacent SCE&G sub-station and has access to all

---

[1] The Property exists against the relevant backdrop of the Lowcountry's well-recognized state of dynamic residential and industrial development. *See, e.g.*, Press Releases, S.C. DEP'T OF COMMERCE, *available at* www.sccommerce.com/search/node/beaufort ("Spartina 449, an Inc. 5000 fastest-growing company, has announced plans to expand its accounting and operations divisions by locating to a 40,000 square-foot facility in Bluffton, S.C."; "BlueSky Processing LLC, a processor of hemp fiber for a variety of applications, today [Nov. 30, 2018] announced plans to location new operations in Beaufort County."; "Geismar, a manufacturer and distributor of railway maintenance equipment, is launching its new operations in Beaufort County."); "Lowcountry Counties Seeing Boom in Investment," CHARLESTON REG'L BUS. J., Aug. 17, 2018, *available at* https://charlestonbusiness.com/news/banking-finance/74998/ (noting Beaufort County's 4.9% business growth, $666 million GDP growth and $183 in federal funding per capita).

municipal utilities including water, sewer and gas. The Property is also unusual for its location: it has significant road frontage on Parker Drive, a newly paved two-lane road off Highway US-21; is less than twenty miles from Interstate-95; and sits between Charleston and Savannah, two major port cities, each of which houses an aerospace manufacturing company. The Property also sits within the Marine Corps Air Station ("MCAS") Overlay Zone, which is a Beaufort County ordinance originally enacted in 2000 that limits activities that may interfere with MCAS flight patterns, including any activities that may produce light, smoke, glare, electronic signals or attract waterfowl.

The restrictive easement significantly limits[2] the Landowners' use of this Property by restricting activity that may lead to physical interference with MCAS flights or may otherwise be "incompatible" with the MCAS "mission." (Dkt. No. 140-1.) Because the Property is currently raw and undeveloped land, the easement necessarily contemplates that the land may be developed. More specifically, the easement forbids:

(1) Any activity, development, or use that would interfere, limit or otherwise be incompatible with "military air operations and the mission of [MCAS]";

(2) human habitation, including temporary accommodations such as trailers, RVs and tents;

(3) the construction or installation of any structure, building, antenna, tower, wire or other man-made obstruction, except as necessary for an allowed use of the encumbered Property, but subject to the Government's approval and authority to deny such an activity;

(4) any use of the encumbered Property that would "unnecessarily" attract birds or waterfowl, including growing vegetation or conducting activities attractive to flocks of birds or waterfowl;

---

[2] For example, Thomas Hartnett, the Landowners' expert witness, testified that the terms of the easement prohibited the Landowners from holding a family reunion on their property (Tr. 109:15-17) and the Commission similarly noted that the Property could not be used as a cemetery because assemblage of more than ten visitors at once would violate the easement.

(5) the construction, installation, alteration or growing of any structure, building, antenna, tower, wire, tree or other obstruction that is taller than 120 feet;

(6) the location of any structure, except fencing, within fifty feet of the Property line abutting MCAS;

(7) any direct or indirect lighting emitted above the horizontal plane;

(8) subdivision of the encumbered Property;

(9) activities of any type that produce smoke, glare or any visual hazard, except that certain controlled burns are permitted, but subject to notice requirements and the Government's authority to deny such activity; and

(10) recreational activities including, but not limited to, hunting and that are for-profit, require surface alteration or other development of the land, or that "encourage the assemblage of groups larger than ten (10) persons."

(Dkt. No. 164 at 6-7; No. 140-1.)

The easement expressly permits the following uses subject to the Government's approval given in the sole discretion of Navy realty specialist Cassandra Norris:

(1) Agricultural uses provided, however, that crops or vegetation attractive to birds or waterfowl are prohibited, as are trees that are taller than 120 feet;

(2) feeding and housing a small number of farm animals;

(3) exploitation of the encumbered Property's natural resources, provided that trees taller than 120 feet are prohibited;

(4) wildlife management;

(5) "naturally occurring water features";

(6) "undeveloped or raw land";

(7) the establishment of retention or detention ponds or impoundments to ameliorate storm water runoff, provided that they do not attract a concentration of birds or waterfowl;

(8) such other uses as may be approved and authorized in writing by the Government, provided the uses are not inconsistent with the purpose of the easement.

(Dkt. No. 164 at 7-8; No. 140-1.)

## II. Legal Standard

### A. Review of Commission's Report

Rule 71.1 of the Federal Rules of Civil Procedure governs proceedings to condemn real property by eminent domain and provides that the Court may appoint a three-person commission to determine the issue of compensation. Fed. R. Civ. P. 71.1(h). The commission "has the powers of a master under Rule 53(c)," including to regulate all proceedings and conduct evidentiary hearings. *Id.* The Court must give the parties notice and an opportunity to be heard on the commission's findings. Fed. R. Civ. P. 53(f). The Court then decides *de novo* any objections to the commission's findings of fact and conclusions of law. *Id.*

In *United States v. Merz*, the U.S. Supreme Court provided guidelines governing the commission's report. 376 U.S. 192 (1964). The commission "need not make detailed findings such as judges do who try a case without a jury[,]" but the commission cannot merely issue conclusory findings. *Id.* at 198. Rather, the commissioners must "reveal the reasoning they used in deciding on a particular award, what standard they try to follow, which line of testimony they adopt, what measure of severance damages they use, and so on." *Id.* "Conclusory findings alone are not enough." *Id.* Nonetheless, not "every contested issue raised on the record before the commission must be resolved by a separate finding of fact[,]" nor "must [there] be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based." *Id.*

## B. Showing of Just Compensation

The Fifth Amendment to the United States Constitution entitles the Landowners to "just compensation" for the taking of their property. U.S. Const. amend. V. "The burden of proving the value of the land taken is on the landowner." *69.1 Acres*, 942 F.2d 290, 292 (4th Cir. 1991), citing *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 274 (1943). "Generally speaking, in condemnation cases valuation is not a matter of mere mathematical calculation, but involves the exercise of judgment." *United States v. Whitehurst*, 337 F.2d 765, 771 (4th Cir. 1964). "'Just compensation' is the amount of money necessary to put a landowner in as good a pecuniary position, but no better, as if his property had not been taken." *69.1 Acres*, 942 F.2d at 292.

Just compensation is measured by the land's "highest and best use." *Id.* "[A] property's highest and best use must be physically possible, legally permissible, financially feasible, and maximally profitable." *Charleston Cnty. Assessor v. LMP Props., Inc.*, 734 S.E.2d 88, 90 (S.C. Ct. App. 2013). "In the absence of proof to the contrary, the highest and best use of property is presumed to be its current use." *69.1 Acres*, 942 F.2d at 292. Nonetheless, "[i]t is a well-established principle that the tribunal whose duty is to determine the value of land taken by eminent domain is not limited to the value of the land for the purposes for which it is actually used, but may consider all uses to which it is adapted and might be put[.]" *Carolina Power & Light Co. v. Copeland*, 188 S.E.2d 188, 192-93 (S.C. 1972). "When a landowner posits that a different use is 'highest and best,' he must show that this use is 'reasonably probable' and that the probability has a real market value." *69.1 Acres*, 942 F.2d at 292; *see also Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of events which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well

as in judicial ascertainment of truth."). "In other words, the owner is to be given, by way of compensation for his land, its fair price for any use for which it has a commercial value of its own in the immediate present or in reasonable anticipation in the near future." *Carolina Power & Light Co.*, 188 S.E.2d at 193.

**III.  Discussion**

**A.  The Property's Value Before the Restrictive Easement**

**1.  *The Industrial Parcel***

The value of the Industrial Parcel before imposition of the restrictive easement turns on the parcel's highest and best use. At trial, the parties each offered testimony by an expert appraiser: Thomas Hartnett for the Landowners and Haywood Newkirk for the Government.[3] The experts agreed that the pre-taking highest and best use of the Industrial Parcel was industrial development, but differed in their choice and analysis of comparable land sales. For example, Mr. Hartnett determined that there were no comparable arms-length sales in Beaufort County, so he considered four land sales, including three in Berkeley County and one in Charleston County, to which he then applied downward adjustments of 15% to 43% for their size and 20% to 35% for their location. From these comparables, Mr. Hartnett opined that the Industrial Parcel's value before the restrictive easement was $20,000 per acre. Mr. Newkirk also considered four land sales, including two in Beaufort County, one near Charleston and one near Savannah. These included sales on unusual terms that were not similar to the subject Property's circumstances, such as land sold by a private developer who owned it for eleven years and held soon-to-expire wetlands

---

[3]  The Government also called appraisal expert Aaron Keith Batson to testify, who did not offer an opinion of the value of the Property before or after imposition of the easement. Mr. Batson testified that determining the Industrial Parcel's highest and best use was "a really difficult question." (Tr. 351:21-352:1.)

-7-

permits, and a bank's foreclosure sale of Commerce Park to the City of Beaufort. Mr. Newkirk then applied a 36% downward adjustment to these sales and concluded from that analysis that the Industrial Parcel's value before the restrictive easement was $7,500 per acre.[4]

During oral arguments, the Government contended that Mr. Hartnett's opinion must be discarded for relying on irrelevant comparables. Having carefully considered this argument, the Court finds this objection is without merit. Real estate appraisal is by its nature an exercise in professional judgment that requires selecting a land sale with a similar buyer, seller, terms, property and easement to the subject Property. Because this Property is distinct in its topography and location, and because this easement is so uniquely restrictive,[5] it is unsurprising that an appraiser would be unable to find a single comparable on-all-fours with the subject Property, and rather would compose a spread of comparables, each of which has property characteristics and sales terms that approximates attributes of the subject Property and circumstances.

Mr. Hartnett and Mr. Newkirk each exercised their professional judgment to select their own comparables and downward adjustments. But after reviewing the record *de novo* and considering the totality of the data points relied on or discarded by each expert, the Court finds Mr. Hartnett's opinion the most persuasive and soundly rooted professional judgment that comports with the Uniform Appraisal Standards for Federal Land Acquisitions. Unif. Appraisal Standards for Fed. Land Acquisition 2016, § 1.2.6, *available at*

---

[4] Mr. Newkirk's opinion of the Industrial Parcel's pre-taking value represents one of three positions taken by the Government over the course of this litigation: first, that just compensation for the encumbered property approximated $1,091,000 (Dkt. No. 7); second, that the Industrial Parcel's pre-taking value was $7,500 per acre on a highest and best use of industrial development (Tr. 520:15-18, Gov. Ex. 1 at 103); and, third, that the Industrial Parcel's pre-taking value was $9,800 per acre on a highest and best use of solar development (Dkt. No. 172 at 23).

[5] Mr. Hartnett described the easement as "the most restrictive easement I've ever seen" in over fifty years of professional experience. (Tr. 110: 1.)

https://www.justice.gov/file/408306/download (noting that subject property's relevant characteristics include "the physical, legal and economic characteristics of the subject property as well as the neighborhood and market in which it is located"); *see also Dominion Energy Carolina Gas Transmission, LLC v. 0.945 Acres in Richland Cnty, S.C. located on Parel R39100-02-02*, No. 3:16-cv-01924-JMC, 2018 WL 1281479, at *3 (D.S.C. Mar. 13, 2018) (finding that expert appraiser's "testimony is credible and more than sufficient to meet [the] burden of proof with respect to determining fair market value").

The Government alternatively raises in its Objections, but did not raise at trial, that the pre-taking value of the Industrial Parcel was $9,800 per acre on the basis of its highest and best use being for solar development. To support this valuation, the Government points to the Landowners' pre-taking negotiations with Southern Current to place a utility-scale solar development on the Property. But even if this constituted a then-current use of the Industrial Parcel for solar development,[6] the Landowners rebutted the presumption that it is also the highest and best use by offering sound expert testimony that it was "reasonably probable" the land could be used for industrial development, for which there is a "real market value." *69.1 Acres of Land*, 942 F.2d at 292.

---

[6] Under the terms of the easement, a permitted use of the encumbered land remains subject to Government approval, which is given in a single Navy employee's sole discretion. The present Navy employee responsible for approved use of the property is Ms. Norris. Ms. Norris previously told the Landowners that "the Navy withholds its approval" of the solar development project and requested more information on glare output. Regardless of whether Ms. Norris's response constituted a final or tentative denial, it illustrates that the Government could draw-out the notice-and-approval process for an indefinite period of time through repeat requests for information. (Indeed, Mr. Hartnett testified that approval from a federal agency could take up to a year and a half.) It is reasonable to believe that a solar industry company would find the time-value of a potential deal with the Landowners less valuable where the deal is contingent on approval by a third-party at some undeterminable future point in time and, therefore, that although technically allowable under the easement, solar development on the encumbered Industrial Parcel was an impracticable use in reality.

For these reasons, the Court finds that the Landowners met their burden of demonstrating the value of the Industrial Parcel before the taking and, therefore, adopts the Commission's finding that the Industrial Parcel's value before imposition of the restrictive easement was $20,000 per acre.

2.  ***The Residential Parcel***

As with the Industrial Parcel, Mr. Hartnett and Mr. Newkirk each offered an expert opinion of the Residential Parcel's fair market value before the taking on the basis of comparable land sales. Mr. Hartnett opined that the highest and best use of the Residential Parcel was residential development consistent with its zoning of one home per three acres. Mr. Hartnett considered three land sales in Beaufort County, between 2014 and 2015, of undeveloped land for $14,000 to $55,000 per acre.[7] Mr. Hartnett then applied a downward adjustment of 10% to 28% for size and up to 25% for location. From this analysis, Mr. Hartnett opined that the Residential Parcel was worth $18,500 per acre before the taking. Mr. Newkirk, by contrast, opined that the highest and best use of the Residential Parcel was residential development only along the road, comprised of only one to three lots, and agricultural or recreational use otherwise. Mr. Newkirk considered three land sales in Beaufort County, including a 101-acre pocket listing and two smaller sales of five and twenty-three acre parcels, respectively. After applying downward adjustments to these sales, Mr. Newkirk concluded that the Residential Parcel was worth $4,800 per acre before the taking.

As with the Industrial Parcel's pre-taking value, the Court considered the rationale underlying each expert's identification of highest and best use, and choice of comparables, and

---

[7]   Mr. Hartnett testified that in his expert opinion, $55,000 for a three-acre lot of residential use land is "a steal" in Beaufort County. (Tr. 110:18-22.)

-10-

finds that Mr. Hartnett's opinion is a more persuasive determination of fair market value rooted in the record. For instance, Mr. Newkirk chose to find that only the road frontage could be developed for residential use, and only for one to three homes. Mr. Hartnett's finding that the entire residentially-zoned parcel could in fact be developed consistent with its zoning for residential use of three-acre lots better reflects the reasonably probable use of the Residential Parcel and the market available for that use.

For the foregoing reasons, the Court finds that the Landowners sufficiently demonstrated the value of the Residential Parcel before the taking and, therefore, adopts the Commission's finding that the Residential Parcel's value before imposition of the restrictive easement was $18,500 per acre.

**B.    The Property's Value After the Restrictive Easement**

As to the fair market value of the encumbered land—both Industrial and Residential Parcels—after the taking, Mr. Hartnett opined that imposition of the restrictive easement diminished the land's value by 75% of its pre-taking value. To reach this conclusion, Mr. Hartnett relied on the general proposition that encumbered land can be diminished to between 25% and 40% of its pre-taking value, and this uniquely restrictive easement diminished the Property to 25% of its pre-taking value.[8] Mr. Hartnett points to no specific sales to bolster his opinion. Mr. Newkirk, by contrast, relied on four land sales, including three hunting properties, to which he applied a downward adjustment of 30% for their superior waterfowl hunting. From this factual analysis, Mr. Newkirk opined that the encumbered property is now worth $3,000 per acre. The Court finds Mr. Newkirk's expert opinion persuasive and supported by the record. As the

---

[8]    Mr. Hartnett testified that it was a strain to conclude that the Property retained 25% of its pre-taking value. (Tr. 108:2-5.)

Government argues, Mr. Newkirk's opinion is the only value based on market evidence that considers the highest and best use of the encumbered land. (Dkt. No. 172 at 14-15.)

The Government objects to the Commission's finding that the restrictive easement diminished the value of the encumbered property by 91% of its pre-taking value and diminished the unencumbered industrial remainder by 10% of its pre-taking value. This objection is with merit and the Court declines to adopt these findings as unsupported by the record. For instance, the Commission recommends that because the Landowners could potentially mine dirt from the remaining unencumbered Industrial Parcel or had previously planted fir trees that could grow short of 120 feet, the land's diminution in value was less than the 20% contended by the Landowners. But, for instance, even assuming the Government approved commercial mining, the record does not establish that commercially exploitable amounts of minerals are in the land or that there is a market for extraction in the reasonably foreseeable future. *See, e.g.*, *United States v. Whitehurst*, 337 F.3d 765, 771-72 (4th Cir. 1964) (noting that while it "is well settled . . . that evidence as to top soil and underlying minerals and materials . . . is not to be ignored[,] . . . [t]here must be some objective support for the future demand, including volume and duration").

The Court, therefore, declines to adopt the Commission's finding as to the value of the Property after the taking and instead finds that the post-taking value of the encumbered property is $3,000 per acre.

C.  **Finding of Just Compensation**

Over sixty years after MCAS flight operations began and notwithstanding preexisting overlay zoning, the Government imposed an extremely restrictive permeant easement over the Landowners' Property. The Government sought to obtain this control over the Property in 2016 because it prudently identified that the land was ripe for the same wave of dynamic and accelerated

development that has recently surged through the Lowcountry of South Carolina. For the same reason, the Government cannot obtain the Property today for yesterday's value.⁹

After careful *de novo* review of the Report and trial record, including all expert and relevant testimony, expert reports and supporting exhibits, the Court finds that full and just compensation by the Government to the Landowners for this taking is $4,441,410.00. This full compensation represents the following specific takings:

Compensation of $3,043,000.00 for the taking of the 179 acre encumbered Industrial Parcel, valued at $20,000 per acre before, and $3,000 per acre after, imposition of the restrictive easement; and

Compensation of $1,398,410.00 for the taking of the 99.22 acre Residential Parcel, valued at $18,500 per acre before, and $3,000 per acre after, imposition of the restrictive easement.

## IV. Conclusion

For the foregoing reasons, the Court **ADOPTS IN PART** and **DECLINES TO ADOPT IN PART** the Commission's Report (Dkt. No. 164) and finds the full just compensation owed to the Landowners by the Government is $4,41,410.00. The Government is **ORDERED** to compensate the Landowners in the amount of $3,350,000.00, in addition to the $1,091,000.00 previously deposited in to the Court.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

April 2, 2019
Charleston, South Carolina

---

⁹ *See St. Regis Paper Co. v. U.S.*, 368 U.S. 208, 229 (1961) (Black, J., dissenting) ("It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with the Government.").